UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

---

MICHAEL R. VEST
1516 SW 325th Place
Federal Way, WA 98023

      Plaintiff,

      vs.                          Case No. 15-CV-600

THE GAVILON GROUP, LLC        **JURY TRIAL DEMANDED**
1331 Capitol Avenue
Omaha, NE 68102

      Defendant.

---

## COMPLAINT

---

COMES NOW the Plaintiff, Michael R. Vest, by his counsel, WALCHESKE & LUZI, LLC, as and for a claim against the Defendant, alleges and shows to the Court as follows:

1. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, as this case involves a federal question, and 28 U.S.C. § 1343, as this case involves an Act of Congress providing for protection of civil rights.

2. The unlawful employment practices of which Plaintiff complains occurred in Avalon, Wisconsin within the Western District of Wisconsin, and therefore venue is proper in this District pursuant to 42 U.S.C. § 2000e-5(f)(3).

3. Plaintiff, Michael R. Vest, is an adult male resident of the State of Washington with a post office address of 1516 SW 325th Place, Federal Way, Washington 98023.

4. At the time of the events giving rise to this Complaint, Plaintiff was an adult male resident of the State of Illinois with a post office address of 113 Centralia Place NE, Poplar

Grove, Illinois 61065.

5. Defendant, The Gavilon Group, LLC, is a foreign corporation with a principal place of business located at 1331 Capitol Avenue, Omaha, Nebraska 68102.

6. Defendant is an "employer" as defined by the Americans with Disabilities Act, as amended by the Americans with Disabilities Act Amendments Act of 2008.

7. Upon information and belief, Defendant operates approximately 340 offices and facilities worldwide.

8. Upon information and belief, Defendant employs approximately 2,100 employees.

9. Upon information and belief, Defendant operates approximately ten (10) locations in the State of Wisconsin.

10. Mr. Vest was a member of the United States Navy from in or about 2005 through January 31, 2014. At the time his service ended, he held the position of Aircraft Engine Specialist.

11. In or about April 2012, Mr. Vest suffered a back injury while a member of the United States Navy. Subsequent testing revealed that Mr. Vest had two degenerative, herniated discs, disc calcification, a pinched nerve in his back, and spinal stenosis (collectively, "Mr. Vest's back disability").

12. As a result of Mr. Vest's back disability, Mr. Vest experienced symptoms including, but not limited to, back pain, numbness through his legs, temporary paralysis of his right leg, significant difficulties lifting, stumbling when he walked, and an inability to walk long distances.

13. As a result of Mr. Vest's back disability, Mr. Vest was "pretty much stuck in one spot."

14. As a result of Mr. Vest's back disability, Mr. Vest was able to only perform seated, administrative work.

15. Mr. Vest's back disability substantially limited the functioning of his musculoskeletal system.

16. Mr. Vest's back disability substantially limited his major life activities of bending, twisting, sitting, standing, reaching, pulling, walking, lifting, and performing manual tasks.

17. On or about June 21, 2012, Mr. Vest underwent a three-level spinal fusion for his back disability (the "three-level spinal fusion").

18. Subsequent to Mr. Vest's recovery from his three-level spinal fusion, Mr. Vest's treating physician advised him that he would be permanently restricted from lifting "too much."

19. Subsequent to recovering from his three-level spinal fusion, Mr. Vest remains physically limited, in that he cannot run, jump, or do push-ups or sit-ups.

20. Subsequent to recovering from his three-level spinal fusion, Mr. Vest occasionally experiences minor pain when walking.

21. Subsequent to recovering from his three-level spinal fusion, Mr. Vest is not limited in his ability to twist or bend.

22. Subsequent to recovering from his three-level spinal fusion, Mr. Vest is able to lift up to approximately seventy pounds over his head without assistance; however, he is not able to repeatedly perform this feat.

23. In or about October 2013, Mike Jennings, a Recruiter from Absolutely American, Inc., contacted Mr. Vest regarding a vacant Assistant Superintendent position with Defendant.

24. On November 11, 2013, Defendant began its interview process with Mr. Vest.

25. Defendant began its interview process with Mr. Vest on November 11, 2013 with a phone interview of Mr. Vest conducted by Tom Lechtenberg, Operations Manager at Defendant.

26. On November 21, 2013, and as a continuation of Defendant's interview process with Mr. Vest, Mr. Vest travelled to Fort Worth, Texas to conduct a site visit of Defendant's grain elevator in Saginaw, Texas.

27. On November 22, 2013, and while conducting his site visit of Defendant's grain elevator in Saginaw, Texas, Mr. Vest disclosed to a senior member of Defendant's operations staff that he was a disabled military veteran.

28. On November 22, 2013, and while conducting his site visit of Defendant's grain elevator in Saginaw, Texas, senior members of Defendant's operations staff discussed the job duties and responsibilities of the Assistant Superintendent position.

29. As explained to Mr. Vest by senior members of Defendant's operations staff on November 22, 2013, the essential functions of the Assistant Superintendent position involved the inspection of equipment, which required the ability to climb stairs and ladders, and enter grain bins.

30. Mr. Vest was physically able to perform the essential functions of the Assistant Superintendent position as described to him on November 22, 2013.

31. During Defendant's interview process with Mr. Vest in November 2013, Defendant informed Mr. Vest that its "goal" or "plan" was for Mr. Vest to be an Assistant Superintendent during his first year of employment with Defendant (or, as stated to Mr. Vest, as little as 6 to 9 months) before moving into a Superintendent position at Defendant.

32. Upon information and belief, Defendant's Superintendents earn base salaries between $60,000 and $65,000, annually.

33. Via letter dated November 26, 2013, Defendant offered Mr. Vest the position of Assistant Superintendent at its Avalon, Wisconsin facility, located at 9231 East Avalon Road, Avalon, Wisconsin 53505 ("Defendant's Avalon, Wisconsin facility").

34. Defendant's Avalon, Wisconsin facility is a grain-handling facility.

35. According to Defendant's November 26, 2013 offer letter to Mr. Vest, his annual base salary as Assistant Superintendent was $51,000, and he was eligible for an employee benefit program, a 401K program, relocation reimbursement, and 15 days of vacation annually.

36. On December 3, 2013, Mr. Vest accepted Defendant's offer of employment as Assistant Superintendent at Defendant's Avalon, Wisconsin location.

37. As of November 26, 2013, Mr. Vest was still a member of the Navy.

38. As of November 26, 2013, Mr. Vest resided in Virginia Beach, Virginia.

39. On or about January 23, 2014, Mr. Vest relocated his wife and three children from Virginia Beach, Virginia to Poplar Grove, Illinois, approximately twenty-six (26) miles from Defendant's Avalon, Wisconsin location.

40. On January 31, 2014, Mr. Vest's military service with the Navy ended.

41. On February 5, 2014, Mr. Vest officially began his employment at Defendant.

42. On February 5, 2014, and while at Defendant's Avalon, Wisconsin facility, Mr. Vest completed new hire paperwork.

43. None of the new hire paperwork Mr. Vest completed on February 5, 2014 asked him if he suffered from a disability, required any medical accommodations, or was physically limited in any way.

44. On February 5, 2014, Taylor Nordstrom, Superintendent and Mr. Vest's direct supervisor, took Mr. Vest on a tour of Defendant's Avalon, Wisconsin facility.

45. During Mr. Vest's tour of Defendant's Avalon, Wisconsin facility on February 5, 2014, Mr. Vest disclosed to Nordstrom that he had a back injury that he sustained in the military.

46. On February 5, 2014, and in response to Mr. Vest's disclosure that he had a back injury that he sustained while in the military, Nordstrom asked Mr. Vest if he had any medical restrictions. Mr. Vest responded by telling Nordstrom that he "might need a little help lifting, but that would be about it," or words to that effect. In response, Nordstrom stated, "Ok, that shouldn't be an issue," or words to that effect, and continued Mr. Vest's tour of the facility.

47. Upon Mr. Vest's arrival to work at Defendant's Avalon, Wisconsin facility the following day, February 6, 2014, Nordstrom immediately told Mr. Vest that there was a phone call he needed to take in the conference room.

48. On February 6, 2014, Mr. Vest spoke with a member of Defendant's Human Resources ("Defendant's HR representative") in Defendant's conference room ("the October 6, 2014 call").

49. During the February 6, 2014 call, Defendant's HR representative stated, "We understand you have a disability. Does it prevent you from doing the job?" or words to that

effect. In response, Mr. Vest stated that he could perform the job duties of his Assistant Superintendent position "just fine."

50. During the February 6, 2014 call, Defendant's HR representative stated, "We feel it's a safety hazard for you to be working here. You can go ahead and leave the premises," or words to that effect.

51. On February 6, 2014, and after the February 6, 2014 call, Mr. Vest left Defendant's premises as instructed.

52. On February 6, 2014, Defendant terminated Mr. Vest's employment.

53. According to Defendant's job description for the Assistant Superintendent position, the "Essential Job Functions" of the position are: "Responsible for elevator daily operational efficiency"; "Monitor and maintain quality of inventory"; "Maintain all elevator and/or terminal equipment including legs, conveyors, grain cleaner, vehicles and other facility equipment"; "Observe and enforce all company policies, including compliance with all required safety, regulatory, environmental, and company programs, including Federal, State, and Local regulations regarding Occupation Health and Safety, Environmental Protection, and Operational Permit requirements"; "Successfully complete required EHS and EHS Management System training"; "Inform Superintendent and/or Location Manager of any safety hazards, environmental issues or system deficiencies in the workplace"; and "Demonstrate regular attendance and timeliness in reporting to work, meetings, and completing assignments."

54. According to Defendant's job description for the Assistant Superintendent position, "Special Demands" of the position are: "Heavy-duty, operational, mechanical, and technical hands-on responsibilities"; "Frequently required to stand, walk, use hands, kneel, and

7

bend"; "Frequently required to lift or move more than 50 pounds"; "Frequently exposed to moving mechanical parts"; "Noise level in the work environment is usually moderate to loud"; and "Outdoor work environment, including heights and inclement weather approximately 80% of the time."

55. Upon information and belief, lifting of heavy objects at Defendant's Avalon, Wisconsin facility is performed with the assistance of equipment.

56. At the time of Mr. Vest's termination, Defendant was aware that Mr. Vest suffered from a back disability.

57. Prior to terminating Mr. Vest's employment on February 6, 2014, Defendant did not request medical documentation from Mr. Vest relating to his back disability.

58. Prior to terminating Mr. Vest's employment on February 6, 2014, Defendant did not request any additional medical information from Mr. Vest relating to his back disability.

59. Prior to terminating Mr. Vest's employment on February 6, 2014, Defendant did not request a physical examination of Mr. Vest.

60. Prior to terminating Mr. Vest's employment on February 6, 2014, Defendant did not require a physical examination of Mr. Vest.

61. Prior to terminating Mr. Vest's employment on February 6, 2014, Defendant did not discuss any potential workplace accommodations with Mr. Vest.

62. On July 1, 2014, Mr. Vest filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), designated as EEOC Charge No. 443-2014-01147C ("Mr. Vest's EEOC charge").

63. In Mr. Vest's EEOC charge, Mr. Vest stated that he suffered from a "back

disability" and that Respondent discriminated against him by failing to reasonably accommodate his disability and by terminating his employment based on his disability.

64. The EEOC issued Mr. Vest a Notice of Right to Sue letter dated June 18, 2015.

65. Mr. Vest has satisfied all conditions precedent prior to bringing this action.

**CAUSE OF ACTION – ADA DISABILITY DISCRIMINATION**

66. Plaintiff realleges and incorporates paragraphs 1 – 65 of this Complaint by reference.

67. The acts giving rise to Plaintiff's Complaint occurred after the enactment of the Americans with Disabilities Act Amendments Act of 2008 ("ADAAA") and, therefore, Plaintiff's back disability is analyzed under the expanded definition of "disability" created by the ADAAA.

68. Pursuant to the Americans with Disabilities Act, as amended by the ADAAA, 42 U.S.C. § 12101, *et seq.*, specifically 42 U.S.C. § 12102(4)(E) and 29 C.F.R. § 1630.2(j)(3)(ii)-(iii), Plaintiff's back disability must be assessed without regard to mitigating measures.

69. Plaintiff is a qualified individual with a disability, as that term is defined by the Americans with Disabilities Act, as amended by the ADAAA, 42 U.S.C. § 12101, *et. seq.*

70. Defendant intentionally discriminated against Plaintiff on the basis of his disability by terminating his employment in reckless disregard for his federally protected rights under the Americans with Disabilities Act, as amended by the ADAAA, 42 U.S.C. § 12101, *et seq.*

71. Defendant intentionally discriminated against Plaintiff on the basis of his disability by failing to reasonably accommodate his disability in reckless disregard for his federally protected rights under the Americans with Disabilities Act, as amended by the ADAAA, 42 U.S.C. § 12101, *et. seq*.

72. As a result of Defendant's intentional discrimination, Plaintiff has suffered damages

in the form of lost wages and benefits, humiliation, embarrassment, degradation, emotional distress, pain and suffering, and attorneys' fees and costs.

**WHEREFORE**, Plaintiff respectfully requests that this Court:

1. Order Defendant to make Plaintiff whole by providing appropriate back pay, front pay and/or reinstatement, compensatory and punitive damages, pre-judgment and post-judgment interest, and reimbursement for other benefits and expenses in an amount to be shown at trial;

2. Grant to Plaintiff his attorneys' fees, costs, and disbursements as provided by statute; and

3. Grant to Plaintiff whatever other relief this Court deems just and equitable.

**PLAINTIFF DEMANDS A JURY AS TO ALL TRIABLE ISSUES.**

Dated this 16th day of September, 2015.

> WALCHESKE & LUZI, LLC
> Counsel for Plaintiff
>
>   *s/ James A. Walcheske*
> James A. Walcheske, State Bar No. 1065635
> Jesse R. Dill, State Bar No. 1061704
> Kelly L. Temeyer, State Bar No. 1066294

WALCHESKE & LUZI, LLC
15850 West Bluemound Road, Suite 304
Brookfield, Wisconsin 53005
Phone: (262) 780-1953
Fax: (262) 565-6469
jwalcheske@walcheskeluzi.com
jdill@walcheskeluzi.com
ktemeyer@walcheskeluzi.com